# EXHIBIT A

# EXHIBIT A

Electronically Filed
3/13/2020 10:24 AM
Steven D. Grierson
CLERK OF THE COURT

1
2   David Mincin, Esq.
    Nevada Bar No. 5427
3   MINCIN LAW, PLLC
    7465 W. Lake Mead Boulevard, #100
4   Las Vegas, Nevada 89128
    dmincin@mincinlaw.com
5   Phone: 702-852-1957
    Fax: N/A
6   *Attorney for Plaintiff*

CASE NO: A-20-812251-C
Department 14

7                    **DISTRICT COURT**

8                 **CLARK COUNTY, NEVADA**

9   CHINA AUTO LOGISTICS, INC. , a Nevada        Case No.:
    Corporation,
10                                                Dept. No.:
                            Plaintiff,
11
    vs.
12
    DLA PIPER, LLP, a Maryland Limited
13  Liability Partnership,

14                          Defendant.

15

16                      **COMPLAINT**

17        Plaintiff China Auto Logistics complains and alleges against Defendant DLA Piper

18  LLP (US) as follows.

19  1.      Plaintiff China Auto Logistics, Inc. ("CALI") is a Corporation organized and existing

20  under the laws of the State of Nevada which prior to the events stated herein was publicly

21  traded on NASDAQ.

22  2.      Defendant DLA Piper LLP (US), LLP is a Limited Liability Partnership organized and

23  registered under the laws of the State of Maryland which transacts business in Clark County,

24  Nevada.  Specifically, CALI is informed and believes, that DLA Piper LLP (US) has

25  appeared as counsel of record on behalf of various clients in Clark County Courts in more

26  than 30 pending and prior court actions and further, DLA Piper LLP (US) has been counsel of

27  record for several transactions that were entered into and consummated in Clark County,

28                      Page 1 of 16

1    Nevada for an aggregate sum that exceeds one billion dollars.

2    3.      As described in more detail below, DLA Piper LLP (US) was ultimately retained for

3    the purpose of assisting the Nevada entity, Plaintiff China Auto Logistics, Inc., through its

4    Audit Committee, to investigate allegations that were made in relationship to a lawsuit that

5    was threatened to be, and which was in fact, filed in Nevada.

6    4.      Defendant DLA Piper LLP (US) holds itself out as a global law firm with lawyers

7    located in more than 40 countries throughout the Americas, Europe, the Middle East, Africa

8    and Asia Pacific and presents that it has the expertise to handle the most difficult cross-border

9    legal matters.

10    5.      CALI is informed and believes and therefore alleges that neither DLA Piper LLP (US)

11    nor any of its associated attorneys are licensed to practice law in the People's Republic of

12    China.

13    6.      Barna Capital Group, Ltd. ("Barna") has alleged it is a Cyprus corporation with offices

14    in the Republic of Cyprus and the Russian Federations and which alleges that at pertinent

15    times it was a minority shareholder of CALI holding as much as 20% of CALI's outstanding

16    shares.

17    7.      In early 2018, representatives of Barna put CALI on notice that it intended to file a

18    shareholder derivative action in Clark County, District Court, State of Nevada against CALI

19    as a nominal party and against members of CALI's board alleging breach of fiduciary duty and

20    other related torts.

21    8.      The Barna complaint was turned over to the Audit Committee of CALI's Board of

22    Directors for the purpose of insuring that a professional, complete and independent

23    investigation of the allegations made in the Barna complaint would be conducted.

24    9.      The primary function of CALI's Audit Committee is to assist CALI's Board of

25    Directors in fulfilling its oversight responsibilities to CALI.

26    10.      As part of its duty to engage and complete an independent investigation, CALI's

27    Audit Committee ("AC"), by and through Howard Barth ("Barth"), caused CALI to retain

28

1    DLA Piper LLP (US) to assist with the independent investigation.

2    11.    Per the terms of the retention CALI was obligated to pay all fees and costs generated

3    by DLA Piper LLP (US), and CALI did in fact pay all fees and costs that were invoiced by

4    DLA Piper LLP (US), which sums exceeded $130,000.00.

5    12.    As part of its retention, DLA Piper LLP (US) knew, and if it did not know then it

6    reasonably should have known, that the primary function of CALI's Audit Committee is to

7    assist CALI's Board of Directors in fulfilling its oversight responsibilities over CALI.

8    13.    DLA Piper LLP (US) was also aware, and if not explicitly aware should reasonably

9    have been aware, at all times, that CALI is a publicly traded corporation in the United States

10    and that a prompt and professional investigation of the Barna allegations would have to be

11    engaged in order to insure that CALI would be able to comply with timely and proper

12    regulatory filings including required filings with the US Securities and Exchange Commission

13    ("SEC").

14    14.    Further and/ or in the alternative, to the extent DLA Piper LLP (US) was retained by

15    the AC, the ultimate beneficiary of the retention was CALI, and the primary objective of the

16    retention was to insure that CALI could properly self-govern itself and meet its statutory and

17    regulatory requirements by commissioning an objective and professional investigation of the

18    BARTH allegations.

19    15.    As part of this retention it was understood and agreed, implicitly if not explicitly, that

20    the goal of the investigation would be to either confirm that the allegations had no merit or, if

21    it was discovered that the allegations had some merit, to craft appropriate remedies to insure

22    they were properly addressed and mitigated.

23    16.    In furtherance of its retention DLA Piper LLP (US) was obligated to and owed a duty

24    of care to the Committee, the Board and to CALI to insure that its investigation was done in

25    an effective and professional manner which would not disrupt corporate operations and

26    business and which complied with any and all applicable criminal and civil laws and

27    regulations.

28

17.     In addition, because DLA Piper LLP (US) is not licensed to practice law in China and because it demonstrated an utter lack of any expertise or knowledge of Chinese laws and customs in all regards, it owed a duty of care to retain a local licensed law firm in China so that Chinese laws and customs would be complied with.

18.     Pursuant to its engagement, DLA Piper LLP (US) made an initial request for documents which, in turn, CALI complied with on May 9 and May 14.

19.     After reviewing the documents provided, DLA Piper LLP (US) determined that it was necessary to complete an on-site collection of electronic materials from CALI's offices and employees located in Tianjin, China.

20.     DLA Piper LLP (US) in turn engaged Control Risks Group Holdings Ltd. ("Control Risks") to assist with the on-site collection of electronic materials.  However, Control Risks at all steps failed to demonstrate any knowledge or expertise with Chinese laws and customs and did not offer any benefit to the investigation.

21.     In furtherance of its investigation, DLA Piper LLP (US) demanded that CALI's employees in Tianjin provide all computers, electronic devices, servers, email access points, and/or any other company data.

22.     DLA Piper LLP (US) also demanded that CALI identify the individual in charge of information technology at CALI who understood how Company employees communicate, where Company data is stored and how it is transferred as well as making available any servers, cloud storage or data repositories which store Company data.

23.     The latter requests by DLA Piper LLP (US) was facially problematic and demonstrated DLA Piper LLP (US)'s ignorance of Chinese criminal laws, civil laws as well as local customs.

24.     The demand for information mandated by DLA Piper LLP (US) raised substantial concerns that DLA Piper was forcing CALI to engage in illegal conduct and was thereby exposing CALI and its directors, officers, managers and employees to potential criminal prosecution and civil liability.  These concerns included but were not limited to:

1      A)     CALI employees have access to, and store on their electronics devices,

2    taxation, customs and port data and other confidential information which is protected by

3    Chinese law.  Disclosure of the information sought by DLA Piper LLP (US) exposed CALI

4    and CALI employees and agents to potential criminal investigation and punishment.

5      B)     DLA Piper LLP (US) demanded that personal laptops and personal smart

6    phones owned by CALI employees would be taken and seized.  DLA Piper LLP (US) made

7    demands as if the electronic devices that it wished to seize were property of CALI.  However,

8    the devices were not owned by CALI and were not its property.  China is a "mobile first"

9    country so everything work and personal is on the same smart phone which is owned and is

10   the property of the employee. Customarily in China, employees access work emails and take

11   work-related phone calls on their own personal electronic devices.  Employees also use their

12   own social media accounts including WhatsApp and WeChat for both personal and work-

13   related communications.

14      From the perspective of CALI employees this was no different than theft of their

15   personal property.  In addition, in China only law enforcement agencies can seize devices in

16   this manner.  CALI employees were therefore extremely concerned that a foreign law firm

17   was demanding that their vital personal electronic devices would be turned over to it.  CALI

18   employees were extremely concerned that taking their personal electronic devices for an

19   unknown amount of time would be extremely disruptive of their ability to communicate with

20   friends and family and to function in every day life.  CALI employees were also extremely

21   concerned that their personal electronic devices were going to be seized without any

22   assurances that their highly personal and confidential information would be safeguarded.

23      By design, DLA Piper LLP (US)'s demands would inevitably cause a mutiny by CALI

24   employees and in fact, as described in more detail below, a mutiny did in fact occur when

25   CALI employee electronic devices were seized in accordance with DLA Piper LLP (US)'s

26   instructions.  In addition, the DLA Piper LLP (US) demands and mandates required CALI to

27   confiscate and convert private property thereby exposing CALI and its officers, directors and

28

1    management to potential criminal investigation, criminal prosecution and civil liabilities.

2        C)    DLA Piper LLP (US)  also demanded information and data from CALI which,

3    if turned over, would cause CALI to breach confidentiality obligations CALI owed to third

4    parties which it does business with.

5    25.    Although CALI was at all times supportive of and cooperative with the investigation,

6    CALI was concerned that the collection of electronic materials DLA Piper LLP (US) would in

7    fact cause a mutiny by its employees and would cause a general disruption of its business

8    operations.  Further, CALI was concerned the course of action chosen by DLA Piper LLP

9    (US) would expose CALI and its officers, directors, management and employees to be

10   exposed to criminal investigation and prosecution as well as to potentially substantial civil

11   liabilities.

12   26.    As a multi-national law firm which holds itself out as specializing in legal matters of

13   this nature, DLA Piper LLP (US) should have been aware of these concerns and prepared to

14   accommodate them without compromising the effectiveness of the investigation.  However,

15   DLA Piper LLP (US) was oblivious to these issues and concerns and ultimately, when it was

16   explicitly told about these issues and concerns, DLA Piper LLP (US) was staunchly and

17   arrogantly opposed to addressing them.

18   27.    Further, DLA Piper LLP (US) failed and refused to retain the assistance of a local law

19   firm which practiced law in China and which was familiar with Chinese laws, customs and

20   practices which could effect the manner by which an investigation could properly proceed.

21   28.    Concerned with DLA Piper LLP (US)'s obliviousness to the potential criminal and

22   civil liabilities DLA Piper LLP (US) was exposing CALI to, CALI expressly conveyed these

23   concerns to DLA Piper LLP (US) including the sending of an email to DLA Piper LLP (US)

24   on May 28, 2018 in which CALI representative Meng Dong expressly stated that the scope of

25   DLA Piper LLP (US)'s intended investigation raised substantial concerns that it would violate

26   Chinese privacy and cybersecurity laws if engaged as DLA Piper LLP (US) intended.

27   However, while raising these concerns, CALI reaffirmed its commitment to cooperate with

28

W:\2019 - DM\4396cali.dlapiper\Complaint 2nd Formatted Draft DM 03-05-20.wpd          March 13, 2020 (8:58am)

1   DLA Piper LLP (US)'s investigation but requested that DLA Piper LLP (US) craft an

2   alternative scope for data collection.

3   29.      In spite of this request by CALI, DLA Piper LLP (US) continued to undertake its data

4   collection efforts while refusing to even discuss an alternative scope.  Further, DLA Piper LLP

5   (US)  proceeded with the investigation while completely failing to  address CALI's concerns

6   that Chinese privacy and cybersecurity laws would be violated and while completely failing to

7   address CALI's concern that it had not yet secured proper consent from outside parties whose

8   consent was also necessary.

9   30.      Concerned with DLA Piper LLP (US) 's inability to properly address the above stated

10  concerns and seeking to improve communications, the Chinese subsidiary of CALI retained

11  the law firm King & Wood Mallesons LLP ("KWM") to improve communications with DLA

12  Piper LLP (US)  and to offer suggestions to DLA Piper LLP (US)  to address the above stated

13  issues and concerns without compromising the effectiveness of the investigation.

14  31.      Pursuant to and in furtherance of its retention, KWM called and emailed DLA Piper

15  LLP (US)  and conveyed numerous concerns that DLA Piper LLP (US)  was required to

16  address prior to proceeding with its intended on-site data collection and investigation.

17        These concerns included:

18  A.      KWM offered to DLA Piper LLP (US) that in order to comply with applicable Chinese

19  laws and customs, data collection should be undertaken by investigators who are familiar with

20  the laws of China, who are Chinese citizens, who conduct the investigation physically in

21  China, and who do not remove any relevant data from China.  In doing so, KWM expressly

22  explained to DLA Piper LLP (US) that it was highly likely that CALI's employees in China

23  would fear that an investigation of the scope demanded by DLA Piper LLP (US) would cause

24  a mutiny.  KWM explained that CALI employees would be extremely reluctant to comply

25  with the requests out of fear that they could be prosecuted for violating Chinese State Secret

26  Laws.  In addition, KWN explained that CALI employees would be reluctant to over personal

27  electronic devices thereby providing private and personal information to a foreign law firm.

28

1    B        KWM also informed DLA Piper LLP (US) of CALI's strong concern about the

2    potential breach of third party confidentiality and information prior to securing the consents of

3    the affected third parties.  CALI was concerned that providing information regarding its

4    business partners would violate confidentiality provisions in its agreements with its business

5    partners and could expose CALI to litigation.  CALI's understanding at the time was that only

6    public authorities could have access to such information without the consent of CALI's

7    business partners.  DLA Piper LLP (US) was expressly informed of these concerns yet refused

8    to take any steps to address them.

9    C        KWM also advised DLA Piper LLP (US) that it needed to be more sensitive to local

10   Chinese customs.  As an example, KWM advised DLA Piper LLP (US) that its use of the

11   word "investigation" was in itself problematic when dealing with CALI's offices and

12   employees in China.  Specifically, the word "investigation" created cultural issues because this

13   word in China usually implies that there has been a "party disciplinary action which warrants

14   an investigation" and is also slang for "incarceration without due process pending further

15   investigation". However, DLA Piper LLP (US) ignored KWM's suggestions concerning the

16   best way to approach the investigation without disrupting CALI's offices and operations in

17   China.

18   32.      Further, DLA Piper LLP (US) was provided with a legal opinion issued by Tianjin

19   Quangong Law Firm, a local law firm in Tianjin, that the independent investigation must

20   comply with Chinese law, including laws associated with the private data of individuals and

21   with the protection of sensitive data related to PRC state interests and which concluded that if

22   the collection of devices demanded by DLA Piper LLP (US) exposed CALI to risks of

23   criminal prosecution and civil liabilities.  However, DLA Piper LLP (US) disagreed with the

24   conclusions made in the memo and boorishly projected that the aforementioned law firm was

25   not sophisticated enough to match its own legal analysis.

26   33.      Accordingly, DLA Piper LLP (US) did not limit or otherwise adjust the scope of the

27   investigation to comply with PRC law as stated in the Tianjin Quangong Law Firm memo.

28

34.     In accordance with the above stated concerns, CALI, through KWM, requested that DLA Piper LLP (US) send a privacy policy, reflecting the limits and precautions DLA Piper LLP (US) would take with regard to data collection. This policy, and confirmation that Control Risks would also comply with the policy, was intended to help to expedite the data collection process and assure employees that their data would be protected and the scope of the investigation appropriately limited. KWM continued throughout to exchange emails with DLA Piper LLP (US) and to request that DLA Piper LLP (US) provide a China investigation policy, or privacy policy, also called a protocol.

35.     It was also brought to DLA Piper LLP (US)'s attention that the Control Risks engagement letter failed to convey that the collected data not be exported outside of China and failed to convey that actions would be compliant with PRC laws in other aspects of the investigation.

36.     Despite these numerous opportunities to do so, DLA Piper LLP (US) never furnished a privacy policy or took any measures to address any of the above stated concerns.

37.     As a multi-national law firm practicing in multiple jurisdictions DLA Piper LLP (US) should have been aware of the above stated issues and concerns that existed, should have been aware of Chinese State Secret Laws and Chinese laws, regulations and local customs and practices, or if unaware, should have invested the time to learn them and to craft means to accommodate them without compromising the investigation.  At all times DLA Piper LLP (US) demonstrated a lack of appreciation for cultural sensitivities, language barriers, and local laws and DLA Piper LLP (US) and potential criminal and civil liabilities they were exposing CALI to and obstinately refused throughout to educate itself about these issues or learn how to accommodate them so that a proper investigation could be completed without violating Chinese laws and without disrupting CALI's employees and operations.

38.     Having received the aforementioned information and fully aware of the concerns that had been expressed, DLA Piper LLP (US) refused to limit its investigation or otherwise implement safeguards or any of the other suggestions it was provided with that were designed

1   to avoid violations of Chinese laws and other breaches stated above.  Instead, DLA Piper LLP

2   (US) proceeded with its efforts and mandated that the investigation proceed with unbridled

3   access to all personal electronic devices of CALI employees.  In compliance with DLA Piper

4   LLP (US) demands and mandates, all employees at CALI's Tianjin's officer were instructed

5   to turn over their personal cell phones, computers and electronic devices.

6   39.   These demands and mandates were made even though employees had not been given

7   assurance that the review would be limited to work-related emails and data, or that the

8   investigation would exclude any personal emails, correspondence, or other private

9   information. Additionally, employees were instructed not to delete or modify the data on their

10  personal devices which exacerbated the situation and created further anxiety for employees..

11  40.   Accordingly and foreseeably, CALI employees who had been mandated to surrender

12  their personal electronic devices were unwilling to do so and a mutiny by CALI employees

13  occurred.  This in turn prevented the investigation from proceeding and it also caused great

14  disruption to CALI's ongoing business operations and damaged the company's general good

15  will with its employees and customers.

16  41.   Further, the seizure and attempted seizure of CALI employees' personal computers and

17  personal phones without their consent caused numerous employees to file criminal complaints

18  with the Tianjin Public Security Bureau.  In response, the Police then came to CALI's offices

19  and to investigate the allegations which included interviewing various executives and

20  managers at CALI's Tianjin office.  The police report alleged that CALI illegally forced its

21  employees to surrender personal laptops and phones by a foreign company for a foreign

22  investigation and created great anxiety for CALI officers, directors, and management that they

23  would be criminally prosecuted for the investigation that DLA Piper LLP (US) had recklessly

24  mandated..

25  42.   In direct response to being investigated by the police for violations that were caused by

26  the seizure of personal electronic devices that was mandated by DLA Piper LLP (US), several

27  members of CALI's Board of Directors and executives who were targeted by the investigation,

28

W:\2019 - DM\4396cali.dlapiper\Complaint 2nd Formatted Draft DM 03-05-20.wpd                                    March 13, 2020 (8:58am)

1    including the CEO and CFO, resigned their positions.

2    43.     The aforementioned seizure of employee personal electronic devices, the ensuing

3    employee mutiny, criminal investigations and other events stated above let to CALI being in a

4    state of complete chaos.  Given these chaotic conditions that were caused by DLA Piper LLP

5    (US), it was impossible for CALI to meet various SEC filing and other governmental

6    regulatory requirements and deadlines ultimately leading to CALI being de-listed as a publicly

7    traded company in the United States.

8    44.     Concerned with the rapidly deteriorating circumstances CALI arranged a conference

9    call on July 2, between DLA Piper LLP (US), K&L Gates LLP, and KWM to discuss issues

10   with the stalled investigation and DLA Piper LLP (US)'s reckless handling of it.

11   45.     After the call, a K&L Gates LLP attorney listed terms under which he hoped DLA

12   Piper LLP (US) might be able to continue its investigation, including getting consent from all

13   willing employees to the data collection process, DLA Piper LLP (US)'s adoption of a

14   compliance policy similar to that of "big four" accounting firms, and that DLA Piper LLP

15   (US) initially screen sensitive data and ensure that such data does not leave China. However,

16   it was unclear that DLA Piper LLP (US) would accept these terms and adjust the investigation

17   accordingly.

18   46.     KWM and K&L Gates LLP continued to exchange emails with DLA Piper LLP (US)

19   discussing their concerns with respect to DLA Piper LLP (US) 's actions, behavior, and

20   manner during conduction of the investigation. In particular, this correspondence included

21   concerns that DLA Piper LLP (US)  was not capable of continuing to conduct the

22   investigation due to its unfamiliarity with basic rules for conducting an investigation in China.

23   KWM further stated that due to DLA Piper LLP (US) 's aggressive handling of employees and

24   the fact that DLA Piper LLP (US) appeared inexperienced at conducting an investigation in

25   China, employees would resist DLA Piper LLP (US)'s data collection efforts.

26   47.     KWM concluded that the AC should consider engaging a "big four" accounting firm to

27   conduct the independent investigation instead of DLA Piper LLP (US) because of the

28

1   tumultuous problems that were caused by DLA Piper LLP (US)'s handling of the

2   investigation and its disregard of Chinese criminal and civil laws and customs,

3   48.      CALI remained willing to cooperate with an independent investigator, as long as PRC

4   and local laws would be complied with Chinese State Secrets Laws. To that end, KWM began

5   facilitating discussion with one of the big four accounting firms and obtained from that firm,

6   Ernst & Young ("EY"), a copy of EY's investigation guidance policy on China State Secrets.

7   49.      K&L Gates LLP suggested the AC meet along with other representatives of CALI to

8   determine whether DLA Piper LLP (US) could continue conducting the investigation or

9   should be replaced in that role. The goal of replacing DLA Piper LLP (US) would be to

10   effectively and promptly complete the investigation while respecting Chinese laws and

11   customs, thus ensuring the cooperation of Company employees and management. Further, the

12   police report filed by employees and the Police's inquiry into CALI were significant issues

13   that would limit DLA Piper LLP (US)'s ability to work with employees to collect data.

14   50.      While the investigation was stalled, KWM and K&L Gates LLP had each attempted to

15   contact Barth to discuss the investigation and mitigate the damage that had already been

16   inflicted.  K&L Gates LLP aimed to set up a conference call with Barth and KWM, to go over

17   these issues. However, K&L Gates LLP was rebuffed by DLA Piper LLP (US), which referred

18   to Barth as "my client" and declined to permit K&L Gates LLP or KWM to contact Barth

19   without DLA Piper LLP (US) 's authorization.

20   51.      DLA Piper LLP (US) had similarly contacted KWM to demand that KWM cease

21   communicating with Barth without DLA Piper LLP (US) 's permission. KWM responded to

22   ask whether DLA Piper LLP (US)  represented Barth. DLA Piper LLP (US) responded "Of

23   course he is my client." DLA Piper LLP (US)  claimed to represent the AC "who acts through

24   its members" and repeated the demand that KWM not contact Barth or other AC members

25   without DLA Piper LLP (US)'s authorization.

26   52.      It appears that DLA Piper LLP (US) maintained this position for the ulterior purpose

27   of deflecting attention away from its incompetent, reckless and damaging role in the

28

1   investigation and only after issues or DLA Piper LLP (US) 's termination arose.

2   53.     However, by cutting off this access to Barth, DLA Piper LLP (US) further stalled the

3   investigation and further impeded CALI's ability to comply with SEC filing and other

4   governmental regulatory requirements and undermined CALI's ability to mitigate the severe

5   damage that had already occurred.

6   54.     On July 3, DLA Piper LLP (US) emailed the relevant parties to explain the

7   investigation issues from its perspective. DLA Piper LLP (US) additionally claimed the "big

8   four" accounting firms did not appear to have standalone privacy policies, but did use review

9   "protocols" for data collection.

10  55.     AC member and Company director Shaohua Bai, along with KWM and K&L Gates

11  LLP, planned a telephone meeting of the AC to discuss ongoing concerns with the

12  investigation.

13  56.     During this conference call, on July 11, Yan Jin provided a summary of the

14  investigation to date, including KWM's requests for DLA Piper LLP (US)'s privacy policy

15  regarding investigations and DLA Piper LLP (US)'s failure to respond to those requests. Yan

16  Jin also detailed DLA Piper LLP (US) 's continued pressure on CALI to collect personal

17  electronics and data without regard to PRC privacy and cybersecurity law as detailed in the

18  June 21 memo. According to Yan Jin, this pressure resulted in the attempted seizure of

19  personal computers, personal smart phones and personal tablets by CALI that in turn led to the

20  employees' report to the Police and the Police's subsequent criminal investigation.

21  57.     DLA Piper LLP (US) attorneys responded on the call to Yan Jin's statements, claiming

22  that DLA Piper LLP (US) did not disregard the June 21 memo or applicable Chinese law, and

23  that it remained committed to completing the investigation on behalf of the AC. However, the

24  investigation remained stalled.

25  58.     As a result of DLA Piper LLP (US) actions stated above, CALI remained unable to

26  comply with SEC filing and other governmental regulatory requirements. On July 17, CALI

27  was left with no choice but to file Form 8-K with the US Securities and Exchange

28

1    Commission ("SEC"). In response, Nasdaq put in place a trading halt for CALI.

2    59.    The next day, Barth resigned from the AC and the Board of Directors.

3    60.    As a result of the chaos that was caused by DLA Piper LLP (US) 's actions and actions

4    that were instituted at its insistence, CALI was unable to achieve compliance with the SEC

5    and was unable to provide a plan for regaining compliance, as of July 24, 2018. On that day,

6    CALI received notification that it would be delisted from Nasdaq.

7    61.    On July 31, DLA Piper LLP (US) withdrew its representation.

8    62.    CALI was de-registered from the SEC on January 7, 2019.

9    63.    As a result of having its stock suspended and de-registered CALI's stock has been

10   reduced to a nominal value even though it had a market capitalization of in excess of

11   $30,000,000.00 within the two year period of the events stated therein.

12   64.    In turn and as a direct result of DLA Piper LLP (US) actions stated above, CALI has

13   been exposed to numerous technical breaches of loan covenants and contractual covenants

14   with third parties thereby causing CALI to absorb loan and contractual penalties, penalty

15   interest and other fees in excess of $1,000,0000.  CALI has also been forced to absorb

16   substantial sums reinstating the aforementioned loans and otherwise attempting to restore its

17   business and mitigate the damage caused by DLA Piper LLP (US).

18   65.    In addition and as a direct result of DLA Piper LLP (US) actions stated above, CALI

19   has been forced to absorb well in excess of $1,000,000 in legal and other professional fees

20   seeking to mitigate the damages caused by DLA Piper LLP (US)' conduct and seeking to have

21   its publicly traded status and general market reputation restored.

22   66.    A competent investigation was later completed by another party without causing an

23   employee mutiny, police investigation or the other disruptions and harm that was caused by

24   the DLA Piper LLP (US) investigation.

25   67.    In order to prosecute this action, it was necessary for Plaintiff to retain the services of

26   counsel to represent Plaintiff and Plaintiff is entitled to a fair and reasonable sum as and for

27   attorneys' fees together with costs of suit.

28

**FIRST CLAIM FOR RELIEF**

68.     China Auto Logistics restates and re-alleges all above paragraphs as if fully set forth herein.

69.     China Auto Logistics, by and through its audit committee, retained DLA Piper LLP (US) to  investigate BARNA's allegations to investigate Barna's allegations and ensure compliance with all requirements and regulations

70.     As part of its retention DLA Piper LLP (US) was further obligated to insure that while a proper and thorough investigation was completed, that the investigation itself would comply with all applicable laws and local customs and would not itself cause disruption to CALI's office operation or its ability to comply with SEC and other government regulations.

71.     By engaging the above stated conduct during the scope of its representation of CALI and its investigation of CALI, the legal services rendered by DLA Piper LLP (US) fell below the standard of care for competent counsel.

72.     As a result of DLA Piper LLP (US)'s failure to meet the standard of care CALI was unable to meet SEC and other regulatory compliance and suffered substantial injuries to its business operations, sustained technical breaches to various loan covenants and otherwise suffered massive financial damages.

73.     As a result of DLA Piper LLP (US)'s negligence and failure to provide legal services and representation that met the standard of care, CALI has sustained damages in an amount that exceeds of $15,000.00.

        As such, Plaintiff China Auto Logistics requests judgment against Defendant DLA Piper LLP (US) as follows.

        1.      For damages in an amount that exceeds $15,000.

        2.      For interest, costs of suit and attorneys fees.

/ / /

/ / /

3.      For such other and further relief as the court may deem just and proper.

DATED this 13th day of March,  2020.

MINCIN LAW, PLLC

By:   /s/   David Mincin
      David Mincin, Esq.
      Nevada State Bar No. 5427
      7465 W. Lake Mead Boulevard, #100
      Las Vegas, Nevada 89128
      *Attorney for Plaintiff*

Electronically Filed
3/13/2020 10:24 AM
Steven D. Grierson
CLERK OF THE COURT

IAFD
David Mincin, Esq.
Nevada Bar No. 5427
MINCIN LAW, PLLC
7465 W. Lake Mead Boulevard, #100
Las Vegas, Nevada 89128
dmincin@mincinlaw.com
Phone: 702-852-1957
Fax: N/A
*Attorney for Plaintiff*

CASE NO: A-20-812251-C
Department 14

**DISTRICT COURT**

**<u>CLARK COUNTY, NEVADA</u>**

CHINA AUTO LOGISTICS, INC., a Nevada
Corporation,

                    Plaintiff,

vs.

DLA PIPER, LLP, a Maryland Limited
Liability Partnership,

                    Defendant.

Case No.:

Dept. No.:

**INITIAL APPEARANCE FEE DISCLOSURE**
**(NRS CHAPTER 19)**

      Pursuant to NRS Chapter 19, as amended by Senate Bill 106, filing fees are submitted

for parties appearing in the above entitled action as indicated below:

      Plaintiff China Auto Logistics, Inc.          $270.00

      TOTAL REMITTED:               $270.00

      DATED this 13th day of March, 2020.

               MINCIN LAW, PLLC

               By:  /s/  David Mincin
                   David Mincin, Esq.
                   Nevada State Bar No. 5427
                   7465 W. Lake Mead Boulevard, #100
                   Las Vegas, Nevada 89128
                   *Attorney for Plaintiff*

W:\2019 - DM\4396cali.dlapiper\Initial Appearance Fee Disclosure...DMcb...3-13-2020.wpd

March 13, 2020 (9:28am)



## Notice of Service of Process

**null / ALL**
**Transmittal Number: 21309549**
**Date Processed: 03/22/2020**

| | |
|---|---|
| **Primary Contact:** | Charlie Deem<br>DLA Piper LLP<br>401 B St<br>Ste 1700<br>San Diego, CA 92101-4297 |
| **Electronic copy provided to:** | Mark Gurley<br>Alida Dagostino<br>Deborah Javins |

| | |
|---|---|
| **Entity:** | DLA Piper LLP (US)<br>Entity ID Number  0637286 |
| **Entity Served:** | DLA Piper, LLP |
| **Title of Action:** | China Auto Logistics, Inc. vs. DLA Piper, LLP |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Others |
| **Court/Agency:** | Clark County District Court, NV |
| **Case/Reference No:** | A-20-812251-C |
| **Jurisdiction Served:** | Maryland |
| **Date Served on CSC:** | 03/18/2020 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | David Mincin<br>702-852-1957 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Electronically Issued
3/13/2020 10:25 AM

1  SUMMS
   David Mincin, Esq.
2  Nevada Bar No. 5427
   MINCIN LAW, PLLC
3  7465 W. Lake Mead Boulevard, #100
   Las Vegas, Nevada 89128
4  dmincin@mincinlaw.com
   Phone: 702-852-1957
5  Fax: N/A
   *Attorney for Plaintiff*
6
                        DISTRICT COURT
7
                    CLARK COUNTY, NEVADA
8
                                        CASE NO: A-20-812251-C
9  CHINA AUTO LOGISTICS, INC., a Nevada    Case No.:
   Corporation,
10                                          Dept. No.: Department 14
                                Plaintiff,
11
   vs.
12
   DLA PIPER, LLP, a Maryland Limited
13 Liability Partnership,
14                              Defendant.
15
                            SUMMONS
16
   **NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU**
17 **WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS,**
   **READ THE INFORMATION BELOW.**
18
   **TO THE DEFENDANT(S):** A civil Complaint has been filed by the Plaintiff against you for
19 the relief set forth in the Complaint.
20     **DLA PIPER, LLP**
       **c/o CSC-LAWYERS INCORPORATING SERVICE COMPANY - RA**
21     **7 ST. PAUL STREET, #820**
       **BALTIMORE, MD 21202**
22
       1.  If you intend to defend this lawsuit, within 20 days after this Summons is served
23 on you, exclusive of the day of service, you must do the following:
24     a.  File with the Clerk of this Court, whose address is shown below, a formal written
   response to the Complaint in accordance with the rules of the Court, with the appropriate
25 filing fee.
26     b.  Serve a copy of your response upon the attorney whose name and address is shown
   below.
27
28                            Page 1 of 2

2.  Unless you respond, your default will be entered upon application of the Plaintiff and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.  If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.  The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators, each have 45 days after service of this summons within which to file an answer or other responsive pleading to the complaint.

Submitted By:

MINCIN LAW, PLLC

By: ____/s/ David Mincin_____
    David Mincin, Esq.
    Nevada Bar No. 5427
    7465 W. Lake Mead Boulevard, #100
    Las Vegas, Nevada 89128
    *Attorney for Plaintiff*

STEVEN D. GRIERSON
CLERK OF THE COURT

By: _Robyn Rodriguez_  3/13/2020
    Deputy Clerk        Date
    Regional Justice Center
    200 Lewis Avenue
    Las Vegas, Nevada 89155
    Robyn Rodriguez

NOTE: When service is by publication, add a brief statement of the object of the action.
       See Rules of Civil Procedure 4(b).

Revised 06/01

W:\2019 - DM\4396cali.dlapiper\Summons For DLA Piper...DMcb...3-13-2020.wpd                    March 13, 2020 (9:43am)